**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Maryjean Johnston,

                                Plaintiff,

           -against-

Commissioner of Social Security,

                                Defendant.

---

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/17/2024
```

**23-cv-05054 (SDA)**

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Maryjean Johnston ("Johnston" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB"). Presently before the Court are Plaintiff's motion for judgment on the pleadings and the Commissioner's brief in opposition.[1] (Pl.'s Mot., ECF No. 11; Comm'r Br., ECF No. 14.)

For the reasons set forth below, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

<u>BACKGROUND</u>

**I.    Procedural Background**

On July 23, 2020, Johnston filed an application for DIB with an alleged onset date of December 12, 2019. (R. 77, 95.) On February 18, 2021, Johnston received a Notice of Disapproved

---

[1] The current Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g) and Standing Order No. 22-MC-00329 (LTS) (S.D.N.Y.), establish simplified procedures and provide that the parties' submissions presenting these actions for decision will be styled as briefs. Regardless of how Plaintiff styled her motion, the Court's review of the Commissioner's decision is the same. *See* 42 U.S.C. § 405(g).

Claim from the Social Security Administration ("SSA"), which denied her application. (R. 114-20.) On May 27, 2021, Johnston sought reconsideration of the SSA's determination. (R. 122.) In a decision dated June 25, 2021, the SSA issued a Notice of Reconsideration and again found that "the previous determination was proper under the law." (R. 123-34.) On July 29, 2021, Johnston filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 135-36.) On December 17, 2021, a hearing was held before ALJ Sharda Singh. (R. 95; R. 1-32.)

In a decision dated January 26, 2022, ALJ Singh found Johnston not disabled. (R. 95-104.) On March 29, 2022, Johnston filed a request for review with the Appeals Council (R. 39, 321-23), which denied her request for review on April 14, 2023. (R. 36-38.) Consequently, ALJ Singh's decision constitutes the final decision of the Commissioner. (R. 36.) On June 15, 2023, Johnston timely filed the Complaint in this action seeking review of the decision. (*See* Compl., ECF No. 1.)

## II.    **Non-Medical Evidence**

Born on August 19, 1968, Johnston was 51 years old on the alleged onset date and 53 years old at the time of ALJ Singh's decision. (*See* R. 77.) Johnston has a high school education, with some college credit, and past work as a "baby tech" where she would take care of babies, assist post-c-section surgical mothers, and push hospital beds. (R. 19, 24, 242.)

On November 28, 2020, Johnston completed a Written Function Report. (R. 249-56.) Johnston reported that she lives in a house with her family. (R. 249.) Her daily activities consist of eating breakfast; watching television, during which time she cannot sit for too long without her back hurting; walking to the mailbox; eating lunch; and then waiting for her husband to cook dinner and clean. (R. 250.) Johnston tosses and turns in bed due to pain. (R. 250.) Johnston shops

in stores for food a couple of days a week (that does not exceed one-and-a-half hours) and goes to physical therapy and to doctors' appointments. (R. 252-53.)

Johnston requires someone to accompany her outside of the house to, for example, push a shopping cart or carry food bags into the house. (R. 253.) She is capable of handling household finances. (R. 252.) Johnston prepares her own meals (sandwiches and cereal because she cannot stand for long periods of time), does not complete any household chores, and requires assistance from her family because any house or yard work causes pain in her back and neck. (R. 251.) Johnston experiences a lot of pain if she lifts, twists or bends. (R. 249.) She also has numbness in her hands from pinches nerves in her neck, left hand weakness that causes her drop things and pain runs down her legs due to a slipped disc in her back. (R. 249.) Due to her pain, Johnston is unable to sit for long periods of time, lift, push a vacuum, wash dishes and sleep. (R. 250.) Her condition affects lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing and using hands. (R. 254.)

III.    **Medical Evidence Before The ALJ**

A.    **August 2019 Through December 2020 Treatment Records**

On August 29, 2019, Johnston had a magnetic resonance imaging ("MRI) of her lumbar spine (the "8/29/19 MRI Report"),[2] following an injury at work. (R. 72, 87, 380, 383, 386, 390,

---

[2] The spine is comprised of five distinct spine segments, which include: (1) the cervical spine (neck) with seven vertebrae (C1-C7); (2) the thoracic spine (middle back) with twelve vertebrae (T1-T12); (3) the lumbar spine (lower back) with five vertebrae (L1-L5); (4) the sacrum (triangle-shaped bone connecting to the hips with five vertebrae (S1-S5); and (5) the coccyx (tailbone) with four vertebrae that compose the bone at the bottom of the spine. *Spine Structure and Function*, Cleveland Clinic (Oct. 18, 2023), https://my.clevelandclinic.org/health/body/10040-spine-structure-and-function [https://perma.cc/WY5B-2SUL]. "Vertebrae" are the 33 small bones (each labeled) that form the spinal canal, which is the tunnel that houses the spinal cord and nerves. *Id.*

393, 397, 400, 403, 407, 410, 414, 417.) The 8/29/19 MRI Report showed degenerative and bulging disc manifesting at L3-4 as loss of T2 disc space signal intensity, and a small posterior disc bulge without evidence of focal disc herniation. (R. 351.) The 8/29/19 MRI Report also noted mild facet joint arthropathy and thickening of the ligamentum flavum along the small posterior disc bulge, leading to mild central canal narrowing. (*Id.*) These findings were new compared to the prior examination on March 83, 2008 (the "3/8/08 MRI Report"). (*Id.*; *see also* R. 353 (copy of 3/8/08 MRI Report).) Johnston also had degenerative and bulging disc[3] manifesting at L4-5 as loss of T2 disc space signal intensity, with a small left posterolateral disc herniation and mild central canal narrowing of an otherwise diffusely bulging disc. (R. 351.) The disc herniation findings were unchanged from the 3/8/08 MRI Report, but the degenerative disc changes were new. (*Id.*) Plaintiff also had a degenerative disc manifesting at L5-S1 as loss of T2 disc space signal intensity, and central and right paracentral disc herniation touching and slightly compressing the right S1 nerve root within the right lateral access. (*Id.*) As compared against the 8/3/08 MRI Report MRI, the disc herniation was larger than the prior examination. (*Id.*)

On October 23, 2019, Johnston had an initial orthopedic evaluation with Dr. Gabriel L. Dassa in connection with a claim for worker's compensation.[4] (R. 330-33.) Upon examination of

---

[3] "Degenerative disk disease" occurs when "the cushioning in your spine begins to wear away." *Degenerative Disk Disease*, Cleveland Clinic (May 27, 2021), https://my.clevelandclinic.org/health/diseases/16912-degenerative-disk-disease [https://perma.cc/AN68-J6QY]. If a disk is bulged, ruptured, or slipped, it is also called a "herniated disk." *Id.* A "herniated disc" is the "protrusion of a degenerated or fragmented intervertebral disc into the intervertebral foramen with potential compression of a nerve root or into the spinal canal with potential compression of the cauda equina in the lumbar region or the spinal cord at higher levels characterized by disruption of the annular fibrosis." *Herniated Disk*, Stedman's Medical Dictionary, No. 251770 (Database Updated Nov. 2014, available on Westlaw).

[4] Any discussion by Plaintiff's treating physicians with respect to her workers' compensastion claim is not relevant for the Court's assessment of her disability challenges under the SSA. *See Simmons v. Colvin*, No.

her cervical spine, Dr. Dassa indicated tenderness on palpation at C1 through C7 with bilateral paraspinal muscle spasms over the trapezial muscle with trigger points, and noted that Plaintiff's range of motion for the flexion, extension, lateral bending and lateral rotation all fell below the normal range. (R. 331.) Johnston also tested positive during the Spurling test[5] on the right. (*Id.*)

On January 15, 2020, Johnston had an MRI of the cervical spine (the "1/15/20 MRI Report"). (R. 349-50.) The 1/15/20 MRI Report indicated that Johnston had a disc bulge at C2-3; disc bulge at C-4 with bilateral neuroforaminal narrowing; disc bulge at C4-5 with right-sided neuroforaminal narrowing; broad-based disc bulge at C5-6 with bilateral neuroforaminal narrowing and lateral recess stenosis and relative bilateral neuroforaminal narrowing; central disc bulge at C6-7 with bilateral neuroforaminal narrowing; and bulging annulus at C7-T1. (R. 349-50.)

On January 22, 2020, Johnston saw Dr. Vito Loguidice for an independent orthopedic examination for her claim with the New York Workers Compensation Board. (R. 324-29.) After detailing her work-related accident on April 1, 2019, Dr. Loguidice noted that Johnston had a normal posture, no limp or antalgic gait, and used a lumbar support. (R. 326.) Upon physical

---

13-CV-01724, 2014 WL 104811 at *7 n. 5 (S.D.N.Y. Jan. 8, 2014) (remand for consideration of workers' compensation evidence not required since the "'standards which regulate workers' compensation relief are different from the requirements which govern the award of disability insurance benefits'" (citation omitted)); *Gillespie v. Astrue*, No. 09-CV-02198 (ADS), 2012 WL 3646820, at *13 (E.D.N.Y. Aug. 23, 2012) ("Plaintiff's treating physicians opined that he was disabled with regard to workers' compensation. However, those determinations are not dispositive, because the standards for workers' compensation are different than those under the Act.").

[5] A "Spurling" test or maneuver "is most commonly defined in the current literature as the passive cervical extension with rotation to the affected side and axial compression." Steven J. Jones & John-Mark M. Miller, *Spurling Test*, Nat'l Library of Medicine (Aug. 8, 2023), https://www.ncbi.nlm.nih.gov/books/NBK493152/ [https://perma.cc/56TJ-JNVW]. "The test is considered positive when radicular pain is reproduced (pain radiates to the shoulder or upper extremity ipsilateral to the direction of head rotation)."

examination, Johnston was measured as 5' 3" tall and weighed 185 pounds, with a body mass index of approximately 32.8. (*Id.*) Upon examination of the cervical spine, Johnston had no spasms, no paraspinal tenderness to palpation, minimal trapezii tenderness on the right, with neurological examination as +5/5 muscle testing throughout the upper extremities, sensory responses intact through the upper extremities, deep tendon reflexes of the biceps, triceps, and brachioradialis were +2 and equally bilaterally and Spurling's test was negative. (R. 327.) Johnston's cervical spine's range of motion fell below the normal ranges. (*Id.*) On examination of her lumbar spine, Johnston had no paraspinal spasms, no paraspinal tenderness upon palpation, no spinous process tenderness, with neurological examination as +5/5 muscle testing throughout the lower extremities, sensory responses were intact, patellar and Achilles reflexes were +1 and equal bilaterally, seated straight leg raising test was negative, and supine straight leg raising test was negative. (*Id.*) Johnston's lumbar spine's range of motion fell at or below the normal ranges. (*Id.*) Dr. Loguidice diagnosed Johnston with cervical spine radiculopathy[6] and lumbar spine radiculopathy. (*Id.*)

On February 12, 2020, Johnston was evaluated again by Dr. Dassa with substantially the same findings as the October 23, 2019 visit. (R. 340-41.) On April 27, 2020, Johnston had an evaluation with Dr. Sukdeb Datta, for pain management. (R. 342-45.) As part of the musculoskeletal examination, Dr. Datta indicated that Johnston's range of motion fell below the normal range of motion across all plans of the cervical and thoracolumbar spines. (R. 343.) Upon palpation of the cervical spine, Johnston had an increased myospasm of bilateral and paraspinal

---

[6] "Radiculopathy" refers to a disorder of the spinal nerve roots. *Radiculopathy*, Stedman's Medical Dictionary, No. 748650 (Database Updated Nov. 2014).

muscles, tenderness at the trapezius and C2 to C6 levels on the left side, and positive for Spurling's maneuver on the left. (*Id.*) As far as the thoracolumbar spine, Johnston has an increased myospasm of bilateral paraspinal muscles: T1-T12, L1-L5, and L5-S1, as well as positive facet loading sign bilaterally at the L3-L4, L4-L5, and L5-S levels, and S1 joint tenderness on the right side. (*Id.*) The straight leg raising test was positive on the right at 30 degrees and the left at 40 degrees. (R. 344.) All maneuvers produced pain and paresthesia down Johnston's bilateral lower extremity. (*Id.*) Johnston's gait was antalgic, favoring the left side, with heel walk and toe walk painful on the right side. (*Id.*) A sensory examination revealed patchy sensory deficit to pinprick and light touch in the left C5, C6, and C7 distribution, as well as the bilateral L4, L5, and S1 distribution. (*Id.*) A motor examination revealed a deltoid, biceps, and triceps 4/5 on the left side and tibialis anterior 4/5 on the right side. (*Id.*)

On June 15, 2020, Johnston had a pain management consultation medical consultation with Dr. Nagendra Shan. (R. 346-48.) Upon evaluation of the cervical spine, Dr. Shan determined that Johnston's range of motion for her flexion, extension, lateral bending and lateral rotation all measured below the normal degrees and noted that Johnston had tenderness in the C5, C6, and C7 region bilaterally. (R. 347.) Upon evaluation of the lumbosacral spine, Johnston tested positive with Spurling's maneuver on the left side, further range of motion deficits for her flexion, extension, lateral bending and lateral rotation, and myospasm and tenderness in the L5-S1 region bilaterally. (*Id.*) Plaintiff's tendon reflexes were a 2/4. (*Id.*) Dr. Shan provided differential diagnoses including: multiple cervical disc bulging, cervical disc herniation, cervical radiculopathy, lumbar disc bulging at multiple levels, and lumbar radiculopathy. (*Id.*) Johnston was treated with Flexeril and Motrin and was rescheduled for her epidural injection was rescheduled. (*Id.*)

On August 31, 2020, Johnston had another follow-up patient evaluation with Dr. Datta. (R. 354-57.) Dr. Datta's positive clinical findings included those reported on April 27, 2020, along with S1 joint tenderness on the right side. (R. 355.)

On November 2, 2020, Johnston was evaluated again by Dr. Shan with substantially the same findings as the June 15, 2020 visit, presenting with pain in her neck (rated 9/10), pain in her lower back (rated 9/10), pain traveling down her legs, irregular numbness in her hand, difficulty sitting and standing in one position for a long period of time, and difficulty lifting heavy items. (R. 361-64.) Upon evaluation of the cervical spine, Dr. Shan noted tenderness in the C3, C4, and C5 bilaterally and C6 on the left side. (R. 362.) Johnston showed a positive FABER test[7] on the right side, straight leg raising on the right side at 50 degrees, and the left side at 45 degrees. (R. 362.) Neurologically, Johnston exhibited patchy sensory deficits to light touch and pinprick to C5-C6 and C6-C7 on the right side, with further sensory deficits in the L4 and L5 on the right side and bilateral S1. (*Id.*) Johnston's tendon reflexes were a 2/4. (*Id.*)

On December 14, 2020, Johnston was evaluated again by Dr. Shan with substantially the same findings as her prior visits. (R. 380-82.) Upon evaluation of the lumbosacral spine, Johnston had tenderness in the L4-L5 and L5-S1 region bilaterally, tenderness in the right S1 joint, and a sensory impairment of the C5-C6 and C6-C7 on the left side, C7 on the right side, L4-L5 on the right side, and S1 bilaterally. (R. 381.) Plaintiff's tendon reflexes were a 2/4 and gait was antalgic. (*Id.*)

---

[7] "The Faber Test . . . is a pain provocation evaluation technique often used when diagnosing sacroiliac symptomology. Faber stands for flexion, abduction and external rotation, which are the primary anatomical movements associated with this test." *Tulipani v. Saul*, No. 3:19-CV-00565 (AVC), 2020 WL 13553266, at *3 (D. Conn. Apr. 13, 2020) (citation omitted).

**B.**     **January 7, 2021 Internal Medicine Consultative Examination – Dr. Paul Mercurio, M.D.**

On January 7, 2021, Johnston saw Dr. Paul Mercurio for an internal medicine consultative examination. (R. 373-76.) Dr. Mercurio noted that Johnston had experienced a work-related accident in August 2013, which has caused pain in both her neck (starting at the base of her skull and extending down to the base of her neck) and back (upper, mid and lower back). (R. 373.) Johnston described the pain as "sharp and aching pain" with an intensity of 8/10. (*Id.*) Johnston told Dr. Mercurio that an MRI scan showed her with multiple slipped discs and that she was being treated with pain medications and physical therapy. (*Id.*) As of the appointment, Johnston described her pain level as 7/10. (*Id.*) Johnston also described her history of hypertension, for which she stated she refused to take medication. (*Id.*) As of the appointment, Johnston's blood pressure was 170/100, which was "quite high." (R. 373-74.)

As far as activities of daily living, Dr. Mercurio noted that Johnston did limited cooking, but was unable to stand for long periods of time. (R. 374.) Johnston did not clean or do laundry because she was not able to bend or lift. (*Id.*) Johnston required assistance, at times, in the shower or to dress such as putting on her stockings or shoes. (*Id.*)

On physical examination, Dr. Mercurio found, *inter alia*, that Johnston appeared to not be in any acute distress, could walk on heels and toes without difficulty, squat fully, and could stand normally. (R. 374.) Johnston did not require any assistive devices or assistance changing for the exam or getting on and off the exam table. (*Id.*) Johnston could rise from the chair without difficulty. (*Id.*) Throughout the exam, Johnston exhibited pain while performing requested activities. (R. 375.) Johnston's spine showed full flexion, tension, lateral flexion bilaterally, and full rotary movement bilaterally, including full range of motion of her shoulders, elbows,

9

forearms, and wrists bilaterally. (*Id.*) There was no evidence of scoliosis, kyphosis, or abnormality in the thoracic spin and Johnston's lumbar spine showed similar full movement. (*Id.*) Johnston had full range of motion in her hips, knees, and ankles bilaterally. (*Id.*) There was no evident subluxations, contractures, ankylosis or thickenings. (*Id.*) Johnston's joints were stable and nontender. (*Id.*) Dr. Mercurio did not note any redness, heat, swelling or effusion. (*Id.*) Johnston's pulses were physiologic and equal with no significant varicosities or tropic changes and no muscle atrophy evidence. (*Id.*) A neurologic examination revealed no sensory defects and 5/5 strength in upper and lower extremities. (*Id.*) Johnston's hand and finger dexterity remained intact with a grip strength of 5/5 bilaterally. (*Id.*)

Dr. Mercurio also evaluated two labs: an x-ray of the lumbrosacral spine, evidencing a possible L-5 spondylolysis (which could not be excluded), and an x-ray of the cervical spine, evidencing a "DJD,"[8] disc height loss. (R. 376-78.) The findings for the cervical spine x-ray demonstrated mild to moderate disc height lost at C5-C6 with anterior osteophytes and minimal uncovertebral arthropathy with no indication of fracture of subluxation. (R. 378.) Johnston's remaining disc spaces and facets are preserved. (*Id.*)

Based on his evaluation, Dr. Mercurio diagnosed Johnston with (1) chronic neck and back pain and (2) uncontrolled hypertension (R. 376.) Dr. Mercurio opined that Johnston would have no limitation for hearing, seeing, speaking or sitting; instead, she would only have a "mild

---

[8] "DJD" likely refers to "degenerative joint disease," also known as "osteroarthritis," which is arthritis characterized "by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints, is more common in old people)." Osteoarthristis, Stedman's Medical Dictionary, No. 637280 (Database Updated Nov. 2014); *see also* Degenerative Joint Disease (DJD), Stedman's Medical Dictionary, No. 254120 (Database Updated Nov. 2014).

limitation for prolonged standing or walking or climbing stairs." (*Id.*) Dr. Mercurio further opined that Johnston would have a moderate limitation for repetitive bending, lifting, carrying or kneeling, but no limitation for reaching or handling objects. (*Id.*)

### C.    February 2021 Through October 2021 Treatment Records

On February 17, 2021, Johnston saw Dr. Donald Cally for an independent orthopedic examination for her claim with the New York Workers Compensation Board. Johnston complained of constant pain in her neck and some intermittent numbness and tingling in her left hand. (R. 386-89.) Johnston also complained of constant pain in her lower back, with difficulty bending forward, and some pain that goes down her right leg to her foot with numbness and tingling in her toes. (R. 387.) The severity of pain in her neck and back varied. (*Id.*) After reviewing 15 different records, Dr. Cally diagnosed Johnston with nonspecific neck pain and nonspecific back pain. (R. 388.) Based on the exam, Dr. Cally determined that Johnston had a temporary moderate to marked (67%) partial disability. (R. 389.) Dr. Cally further determined that Johnston could not do her usual and customary job; instead, she could work light or modified duty position with no repetitive lifting, bending, pushing, pulling or carrying, with a lifting restriction of 10-15 pounds and capable of ADLs. (*Id.*)

On February 17, 2021, Dr. J. Rosenthal issued a Physical Residual Functional Capacity ("RFC") Assessment as to Johnston's disability claim. (R. 71-73.) Dr. Rosenthal rated Johnston's exertional limits as follows: occasional (cumulatively 1/3 or less of an 8 hour day) lift and/or carry (including upwards pulling) of 20 pounds; frequently (cumulatively more than 1/3 up to 2/3 of an 8 hour day) lift and/or carry (including upward pulling) of 10 pounds; stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday; sit (with normal breaks) for a total of

6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls) unlimitedly, other than shown for lift and/or carry; and had no postural limitations; no manipulative limitations; no visual limitations; no communicative limitations; and no environmental limitations. (*Id.*)

On May 11, 2021, Johnston saw Dr. Cally again for an independent orthopedic examination in connection with her worker's compensation claim. (R. 393-96.) Dr. Cally noted that Johnston was well-developed, well-nourished, with a normal station and gait, and who used no assistive aids to ambulate. (R. 394.) Upon examination of Johnston's neck, Dr. Cally noted that the neck demonstrated no deformity, had some slight tenderness to palpation, has a flexion of 50 degrees, extension of 50 degrees, and rotation of 70 degrees, symmetric reflexes at the biceps, triceps, and brachioradialis, negative as to Hoffman's sign,[9] negative reverse radial reflex, and her motor and sensory examination was normal. (*Id.*) Johnston's lower back demonstrated no deformity, some slight tenderness to palpation, symmetric reflexes at the knees and ankles, no clonus, and she was able to forward bend 30 degrees, and her motor and sensory examination were normal, and she had a negative straight leg raise bilaterally. (*Id.*)

Dr. Cally noted that Johnston had not improved since he last saw her, but that she was to proceed with an epidural injection for her neck and back as appropriate, and physical therapy. (R. 395.) Dr. Cally assessed that Johnston "c[ould] work light or modified duty position[10] with no

[9] "A positive Hoffman's sign may indicate a neurological or nervous system condition that affects the cervical spine nerves or brain." *Donofrio v. Saul*, No. 18-CV-09968 (ER), 2020 WL 1487302, at *8 (S.D.N.Y. Mar. 27, 2020) (citation omitted).

[10] The Court notes here that Dr. Cally's assessment was with respect to Plaintiff's worker's compensation claim and thus, the terms "light" work and "modified duty position" are limited to Dr. Cally's assessment for Plaintiff to perform her prior job, not any similar meaning as those terms may be denied under the SSA. *See Bridget S. v. Kijakazi*, No. 20-CV-01440 (ATB), 2022 WL 2046364, at *10 (N.D.N.Y. June 7, 2022)

repetitive lifting, bending, pushing, pulling, or carrying[]" and that "[s]he require[d] a lifting restriction of approximately 10 to 15 pounds." (*Id.*) Johnston is capable of ADLs. (*Id.*)

On June 25, 2021, Dr. M. Perrotti issued a Physical RFC Assessment as to Johnston's reconsideration claim. (R. 85-88.) Dr. Perrotti found and rated Johnston's exertional limits the same as those that Dr. Rosenthal previously indicated. (R. 86-87.)

On March 8, 2021, Johnston had another medical visit with Dr. Shan. (R. 390-92.) Dr. Shan noted that Johnston was uncomfortable and it was difficult for her to sit up straight in on a chair. (R. 390.) Johnston's cervical and lumbosacral spine's range of motion fell below the normal indicator on all planes, and showed a diminished range of movement. (R. 390-91.) Johnston exhibited tenderness in the L3, L4, and L5 bilaterally and in the right S1. (R. 391.) A facet loading test was positive at L4-L5, and S1, a provocation test was positive, and a straight leg raising test was 55 degress on the right side and 40 degrees on the left side. (*Id.*) A FABER test was also positive. (*Id.*) Neurologically, Johnston showed deficits at C3, C4 and C5 on the right side and S1 on the left side. (*Id.*) Johnston's deep tendon reflexes were marked 2/4 and her gait was antalgic. (*Id.*) For treatment, Johnston was to continue with physical therapy and chiropractic treatment, would receive a lumbar epidural injection in the future and will continue with Motrin and Flexeril. (R. 392.)

On May 17, 2021, Johnston was evaluated again by Dr. Shan with substantially the same findings as the March 8, 2021 visit. (R. 397-99; *see also* R. 400-402.) This time, however, Dr. Shan noted that Johnston exhibited tenderness in the L3, L4, and L5 bilaterally, and a FABER test was

(noting physician's conclusions regarding plainiff's disability or ability to perform a particular exertional category of work is "not binding on the [SSA.]").

13

positive on the right side. (*Id.*) For treatment, Johnston was to continue physical therapy and chiropractic case, and receive a lumbar epidural injection. (R. 399.)

On June 14, 2021, Johnston had a follow-up patient evaluation with Dr. Datta. (R. 403-06.) Johnston's cervical and thoracolumbar spine's range of motion fell below the normal indicator on all planes. (R. 404.) Upon a palpation examination of Johnston's cervical spine, there was increased myospasm of bilateral paraspinal muscles, tenderness at the trapezius and C2 to C6 on the left side, and Spurling's maneuver was positive on the left. (*Id.*) Upon a palpation examination of Johnston's thoracolumbar spine, there was increased myospasm of bilateral paraspinal muscles at T1-T12, L1-L5, and L5-S1, a positive facet loading sign bilaterally at the L3-L4, L4-L5, and L5-1 levels, with S1 joint tenderness present on the right side. (*Id.*) Johnston's straight leg raising test was positive on the right at 30 degrees and on the right at 40 degrees; all maneuvers produced pain and paresthesia down her bilateral lower extremity. (*Id.*) Johnston's gait was antalgic, favoring the left side with heel walk and toe walk painful on the right side. (*Id.*) Neurologically, Johnston had patchy sensory deficit to pinprick and light tough in the left C5, C6, and C7 distribution as well as the bilateral L4, L5 and S1 distribution. (*Id.*) As far as the motor examination, Johnston's deltoid, biceps, and triceps were 4/5 on the left side and tibialis anterior 4/5 on the right side. (*Id.*) Johnston's tendon reflexes were marked 2/4. (R. 404-05.) For treatment, Dr. Datta recommended an MRI of the thoracic spine, bilateral epidural injections, physical therapy, chiropractic care, and NSAIDs and muscle relaxants as needed for pain relief. (R. 405.)

On September 13, 2021, Johnston had another medical visit with Dr. Shan. (R. 407-09.) Johnston's medical records were consistent with her records from her May 17, 2021 visit. (*Id. see also* R. 397-99.)

On October 12, 2021, Johnston had another independent orthopedic examination with Dr. Cally with substantially the same findings as the May 11, 2021 visit. (R. 410-13.) Dr. Cally diagnosed Johnston with (1) nonspecific neck pain, rule out cervical radiculopathy, and (2) nonspecific low back pain, rule out lumbar radiculopathy. (R. 411.) For treatment, Johnston was to proceed with an epidural injection for her lumbar spine as appropriate, physical therapy, and an epidural injection for the cervical spine with respect to her neck pain. (R. 412.)

On October 25, 2021, Johnston had another visit with Dr. Shan. (R. 414-16.) Johnston's medical records were consistent with those from her September 13, 2021 visit. (*Id.*; R. 407-09.) On November 22, 2021, Johnston saw Dr. Shan again. (R. 417-19.) Johnston's medical records were consistent with those from her October 25, 2021 visit. (*Id.*; R. 414-16.)

## IV. The Administrative Hearings

### A. Plaintiff's Testimony

During the December 17, 2021 hearing, Plaintiff testified that in December 2019 she was in a cleaning utility closet stocking shelves where she picked up a clear plastic bag full of ice packs and when she lifted it up, she felt pain in her back and down her leg. (R. 6.) Despite experiencing pain, she continued to work, thinking that the pain would "just go away eventually." (R. 6-7.) After the pain continued through the night and into the next day, Plaintiff testified that she called a doctor to make an appointment. (R. 7.) Upon seeing her doctor, Plaintiff testified that he put

her on "light duty," but because her job did not have a light duty, she was unable to go back to work. (*Id.*)

Plaintiff testified that her prior work consisted of providing care at an assisted living community where she helped patients get out of bed, get dressed, showered, and getting them downstairs for breakfast, often requiring her to lift and carry approximately 30 pounds. (R. 19.) Later in her career, Plaintiff worked with babies pushing cribs and taking care of mothers and also orthopedic surgical patients where she assisted in dressing them and preparing for physical therapy. (R. 24.)

Due to her continuing symptoms, Plaintiff had difficulty sleeping at night due to pain in her back, difficulty sitting for long periods of time (exceeding 30 minutes), could not lift, had tingling down her right leg, weakness in her left hand, and experienced pain when she raised her arms above her head. (R. 7-8.) Whenever Plaintiff required mobility to go anywhere, she can only walk for about an hour and a half, with intermittent breaks throughout, before having to sit down. (R. 8.) The breaks relieve pressure in the middle of Plaintiffs back; however, Plaintiff had to stand up again as her lower backs started to hurt from sitting down. (*Id.*) Plaintiff testified that she could comfortably lift or carry ten pounds with both hands. (R. 9.) Plaintiff also experienced difficulty reaching directly in front of herself as it would pull on her lower part of her back. (*Id.*) This included lifting a cup or a bowl. (R. 17.) As far as the pain that she experienced in her back, Plaintiff testified that on a scale of one to ten, with ten being a rating of the worst possible pain, her level was an eight. (R. 10.) While medication, epidural shots and physical therapy had decreased this rating, Plaintiff reported that herhypertension and neuropathy (which impacted her feet) further contributed to her inability to work. (R. 10-11.)

Plaintiff also reported difficulty driving to the doctor or physical therapy, which also required taking breaks while driving of five to ten minutes. (R. 11.) The physical therapy for pain in her left arm and hand had improved her pain "[v]ery little." (R. 16.) Plaintiff could not clean her house, stand at the sink to do dishes, or cook and could no longer wear slip-on shoes because she had difficulty bending down to tie her shoes, and she wore a back brace as she was not allowed to do any kneeling, bending or crawling. (R. 12.) Plaintiff could only get about two hours of sleep because her legs were restless, which impacted her alertness the next day. (R. 13.)

Plaintiff testified that she had "pain almost all the time." (R. 14.) In addition to her back pain, Plaintiff had pain that ran down her leg, numbness in her left hand (which causes her to drop things) and a stiff neck. (*Id.*) She had to do almost everything with her right hand because she "can't really grip with the left hand." (*Id.*) Plaintiff testified that she got distracted because she was "constantly dealing with pain all of the time." (*Id.*) Out of a given week, Plaintiff had two "good days." (R. 15.) The quality of her life had been impacted as she could no longer hike, play sports, go into her yard, and garden her flowers. (*Id.*) Plaintiff used a computer or laptop, approximately once or twice a day, without any difficulty using a keyboard.

### B.    Vocational Expert Testimony

Vocational Expert ("VE") Christina Boardman testified at the hearing held on December 17, 2021. (R. 22, 32.) Based on the information available in the record, VE Boardman characterized Plaintiff's past work as a home health aide (Dictionary of Occupational Titles ("DOT") code 354.377-014)[11] with a medium exertional strength and an SVP of 3, and also as a

---

[11] The DOT "gives a job type a specific code and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).

17

child monitor (DOT code 301.677.010) performed with a medium exertional strength and an SVP of 3. (R. 25.)

ALJ Singh asked VE Boardman to assume a hypothetical person of Johnston's age, education, and past work experience who was limited to a light exertional level, with a sit-stand option after one hour, having to sit down for one to two minutes and stand back up, while not being off task, and limited to fine and gross hand manipulations with the left non-dominant hand and limited to frequently reaching in front with the left non-dominant arm, who can never climb ladders, ropes or scaffolds, occasionally climb ramps/stairs, balance, stoop, kneel crouch, and crawl to perform Johnston's past work. (R. 26.) VE Boardman testified that such a person could not perform Johnston's past work. (R. 26-27.) However, VE Boardman further testified that such a person could perform other jobs in the national economy such as office helper (DOT code 239.567-010), routing clerk (DOT code 222.687-022) and small products assembler (DOT code 706.684-022). (R. 27.) If the hypothetical changed the use of fine and gross hand manipulations with the left hand to reaching occasionally in front with the left arm, an individual still could not complete Johnston's past work, but could perform jobs in the national economy such as usher (DOT code 344.677-014), host/hostess (DOT code 349.667-014) and counter clerk (DOT code 249.366-010). (R. 27-28.) If the hypothetical changed a third time to add to the two prior hypotheticals, where an individual would need to take unscheduled breaks outside of the normal eight-hour breaks resulting in the person being off task for more than 15% of a workday, they could not perform Johnston's past work nor any other job in the national economy. (R. 28-29.)

**V.      ALJ Singh's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards, Point II, ALJ Singh found at step one that Johnston had not engaged in substantial gainful activity since the alleged onset date. (R. 96-97.)

At step two, ALJ Singh determined that Johnston had the following severe impairments: degenerative disc disease of the cervical and lumbar spine with radiculopathy and obesity, which significantly limited Johnston's ability to perform basic work activities as required by Social Security Ruling ("SSR") 85-28.[12] (R. 97.)

At step three, ALJ Singh found that Johnston did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in the Listing of Impairments 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 98.) Specifically, ALJ Singh determined that Johnston's spinal impairments did not meet Listing 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)) or Listing 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina). (*Id.*) ALJ Singh determined that, while the record indicated some symptoms including pain and muscle fatigue, there was no evidence of any radicular neurological signs, including muscle weakness and signs of nerve root irritation, or sensory changes and decreased tendon reflexes. (*Id.*)

---

[12] *See* Soc. Sec. Admin. Program Policy Statement Titles II & XVI: Medical Impairments That Are Not Severe, SSR 85-28, 1985 WL 56856 (S.S.A. July 2, 1996) ("purpose" as clarifying "the policy for determining when a person's impairment(s) may be found 'not severe' and, thus, the basis for a finding of 'not disabled' in the sequential evaluation of disability, and thereby reflect certain circuit court decisions that have taken issue with the Secretary's previously stated definition of 'not severe' impairments").

ALJ Singh also considered the effect of obesity under SSR 19-2;[13] however, she found that there was no evidence that Johnston's obesity alone or in combination with another impairment met or medically equaled a listing. (*Id.*) ALJ Singh did however consider Johnston's obesity in assessing the RFC. (*Id.*)

Based on her assessment of the entire record, ALJ Singh then assessed Johnston's RFC and found:

> [T]hat the claimant has the [RFC] to perform light work[14] as defined in 20 CFR 404.1567(b) except the claimant requires a sit/stand option, that after one hour she is can [sic] sit for 1-2 minutes and then stand back up, while not being off task. She is limited to frequent fine and gross hand manipulations with the left, non-dominant hand, and frequent reaching in front with the left, non-dominant upper extremity. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.

 (R. 98.) ALJ Singh thus found that Johnston could perform light exertional level work consistent with the above RFC. (R. 102.)

---

[13] *See* Soc. Sec. Ruling Titles II & XVI: Evaluating Cases Involving Obesity, SSR 19-2p (S.S.A. May 20, 2019) (providing guidance on "how we establish that a person has a medically determinable impairment (MDI) of obesity and how we evaluate obesity in disability claims under Titles II and XVI of the [SSA].").

[14] "Light work" involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

At step four, ALJ Singh found that Johnston was not able to perform her past relevant work as a home health aide or as a child monitor as the exertional demands of her past work exceeded Johnston's RFC. (R. 102.)

At step five, ALJ Singh considered Johnston's age, education, work experience and RFC and concluded, relying on testimony by the VE, that there were jobs that existed in significant numbers in the national economy that she could perform. (R. 103.) Therefore, ALJ Singh found that Johnston was not disabled as of December 12, 2019 through the date of ALJ Singh's decision. (R. 103-04.)

On March 29, 2022, Plaintiff sought review of ALJ Singh's decision. (R. 39-40.) On April 14, 2023, the Appeal Council denied Plaintiff's request for review. (R. 36-40.)

## LEGAL STANDARDS

### I.    Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action

unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Wilson v. Colvin*, 107 F. Supp. 3d 387, 400 (S.D.N.Y. 2015) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work,

we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).[15]

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

---

[15] Before classifying a claimant's RFC "based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), [an ALJ] must 'first identify the individual's function limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Soc. Sec. Admin. Policy Interp. Ruling Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) ("SSR 96-8p")). However, remand is not necessary for failure to perform an "explicit function-by-function analysis" "[w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *Id.* at 177. The "RFC assessment must address both the remaining exertional and nonexertional capacities of the individual." SSR 96-8p, 1996 WL 374184, at *5. "Exertional capacity" addresses "an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: [s]itting, standing, walking, lifting, carrying, pushing, and pulling." *Id.*

**DISCUSSION**

In support of remand, Plaintiff argues that ALJ Singh's RFC determination is not supported by substantial evidence because ALJ Singh failed to (1) assess her ability to perform work activities on a function-by-function basis, and (2) consider Dr. Cally's assessed medical limitations. (Pl.'s Mem. at 15-18.) The Court considers each of these arguments in turn.

Plaintiff first argues that the RFC determination is not supported by substantial evidence because ALJ Singh separately failed to consider Plaintiff's ability to perform work activities on a function-by-function basis such that the decision "did not include any meaningful discussion regarding her ability to stand, walk or sit and, therefore, it is difficult, if not impossible, to conduct any sort of meaningful review of [the RFC determination]." (Pl.'s Mem. at 16-17.) The Commissioner contends that ALJ Singh cited the applicable regulations that define the exertional requirements and set forth her analysis in functional terms. (Comm'r Br. at 18.) Moreover, the Commissioner argues that the ALJ was not required to perform a function-by-function assessment since the Second Circuit explicitly has rejected a *per se* categorical approach and the RFC determination is supported by substantial evidence. (*Id*. at 18-19.) The Court agrees with the Commissioner.

Before classifying a claimant's RFC "based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), [an ALJ] 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki*, 729 F.3d at 176 (quoting SSR 96-8p, at *1). "The function-by-function assessment is meant to ensure that the ALJ does not overlook an individual's particular limitations or restrictions which 'could lead to an incorrect use of an

25

exertional category.'" *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 313 (W.D.N.Y. 2013) (quoting *Cichocki*, 729 F.3d at 176) (internal citation omitted). However, remand is not necessary for failure to perform an "explicit function-by-function analysis" "[w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *Id.* at 313 (citing *Cichocki*, 729 F.3d at 177).

Here, ALJ Singh expressly considered SSR 96-8p, which provides the exertional considerations that she was required to consider in assessing Plaintiff's impairments. (R. 96-97.) While ALJ Singh did not explicitly perform a function-by-function assessment, it is evident from her decision that she considered evidence relevant for each function and her analysis provides an adequate basis for meaningful review. (*See* R. 98-102.)

Plaintiff contends that the ALJ did not meaningfully consider Plaintiff's ability to stand, sit or walk, but, notably, does not point to any specific evidence that she contends the ALJ ignored or overlooked. (Pl.'s Mem. at 17.) Indeed, the ALJ discussed Plaintiff's MRI results, treatment records and opinion evidence relevant to her ability to sit, stand and walk and reasonably determined that she was capable of performing light work with additional limitations, including a sit/stand option where she can sit for one to two minutes and then stand back up. (*See* R. 98.) The ALJ acknowledged Plainitff's testimony that she was unable to maintain prolonged positioning such as sitting or standing due to back pain, numbness and stiffness, as well as positive clinical findings regarding range of motion, muscle spasms, diminished reflexes and mild sensory defects. (*See* R. 99-100.) However, the ALJ contrasted these findings with other objective

26

medical evidence in the record indicating intact sensation and reflexes, 5/5 motor strength, and negative straight leg raising. (*See* R. 100-01.) In addition, the ALJ considered relevant opinion evidence, including Dr. Rosenthal's opinion that Plaintiff could perform the full range of light work, but found that further limitations were warranted based on Plaintiff's testimony. (*See* R. 101.) The ALJ also relied upon the consultative examiner's opinion that Plaintiff had no limitation in sitting and was mildly limited for prolonged standing and walking. (*See* R. 101-02.) Thus, the Court finds that the ALJ adequately considered Plaintiff's work-related functions and that her RFC assessment is supported by substantial evidence. Accordingly, remand is not required on this basis. *See Cichocki*, 729 F.3d at 177; *see also Capezza v. O'Malley,* No. 23-CV-01813 (SDA), 2024 WL 642961, at *11 (S.D.N.Y. Feb. 15, 2024) (function-by-function assessment not required when ALJ applied proper legal standards and RFC determination was supported by substantial evidence); *Hubbard v. Kijakazi*, No. 23-CV-00883 (JLC), 2023 WL 8615788, at *9 (S.D.N.Y. Dec. 13, 2023) (remand not required when ALJ addressed all relevant limitations and explained how he supported findings despite not providing explicit function-by-function analysis of all possible limitations).

Plaintiff's second argument in support of remand is that ALJ Singh committed an error by determining that Plaintiff could lift the weight provided in the definition of "light work"[16] with no repetition limitation. (Pl.'s Mem. at 17-18.) Plaintiff argues that, "[a]lthough not entirely clear, the ALJ appears to have disregarded virtually all of Dr. Cally's assessed limitations." (*Id*. at 18; *see also* Pl.'s Reply, ECF No. 15, at 2-3 .) In opposition, the Commissioner contends that ALJ Singh's

---

[16] *See* 20 C.F.R. § 404.1567(b) ("lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

rationale for the RFC determination is sufficiently supported by the record and that Plaintiff has not demonstrated that ALJ Singh's interpretation of Dr. Cally's opinion, which is generally supportive of the RFC determination, was unreasonable. (Comm'r Br. at 20.)

Dr. Cally opined that Plaintiff could perform light or modified duty work without repetitive lifting, bending, pushing, pulling, or carrying with a lifting restriction of 10-15 pounds. (Pl.'s Mem. at 17.)[17] The ALJ found Dr. Cally's opinions "generally persuasive[,]" as they were consistent with Dr. Cally's objective findings and supported by other treatment records and the consltuative examination. (R. 101.) Although the ALJ did not explicitly discuss her determination that Plaintiff could lift up to 20 pounds, as opposed to the 10-15 pounds opined by Dr. Cally, the Court can glean the rationale of the ALJ's decision. *See Cichocki*, 729 F.3d at 178 n.3 ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the Court] to glean the rationale of an ALJ's decision."); *cf. Sherry L. v. Comm'r of Soc. Sec.*, No. 20-CV-01432 (JGW), 2022 WL 2180159, at *6 (W.D.N.Y. June 16, 2022) ("[F]ailure to discuss and/or weigh a medical opinion is not per se remandable error but may be found harmless error.") (collecting cases).

The ALJ explained that she found Dr. Cally's opinions supported by the consultative examination of Dr. Mercurio, who opined that Plaintiff was moderately limited for repetitive bending, lifting, carrying and kneeling. (R. 101-02.) The ALJ also found Dr. Rosenthal's and Dr. Perrotti's opinions persuasive as to light exertional demands given that they were well supported by other medical opinions, but added additional limitations based on Plaintiff's testimony and

---

[17] With respect to Dr. Cally's opinions, Plaintiff cites to pages 543 and 544 of the administrative record. (*See* Pl.'s Mem. at 17.) However, the record only consists of 419 pages. Dr. Cally's relevant opinions are contained on pages 389, 395 and 412 of the record.

the duration of her symptoms. (R. 101.) The ALJ was entitled to weigh these opinions to come up with an RFC that was consistent with the record as a whole. *See Roane v. O'Malley*, No. 22-CV-10704 (AEK), 2024 WL 1357845, at *7 (S.D.N.Y. Mar. 29, 2024) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)) ("Although an ALJ's RFC determination 'may not perfectly correspond with any of the opinions of medical sources cited in his [or her] decision, he [or she] [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'"). Moreover, although the ALJ did not include a restriction on repetitive lifting, courts in this Circuit have found mild to moderate limitations as to repetitive lifting consistent with an RFC for light work. *See Cuevas v. Comm'r of Soc. Sec.*, No. 18-CV-00669 (DB), 2019 WL 4221375, at *8 (W.D.N.Y. Sept. 5, 2019); *see also Amanda L. v. Saul*, No. 18-CV-01221 (NAM), 2019 WL 5865388, at *8 n.3 (N.D.N.Y. Nov. 8, 2019) ("[M]oderate limitations to repetitive lifting, bending, reaching, pushing, pulling, or carrying are not inconsistent with an RFC for a full range of light work.") (internal quotation marks and citation omitted); *Myers v. Comm'r of Soc. Sec.*, No. 16-CV-00080 (MAT), 2018 WL 2381885, at *3 (W.D.N.Y. May 25, 2018) (finding ALJ's determination not to include limitations on repetitive lifting did not constitute reversible error).

Plaintiff also contends that the ALJ "cherry picked" evidence in support of her RFC determination (Pl.'s Mem. at 18), but does not identify what evidence the ALJ disregarded or failed to consider. *See Rosario v. Comm'r of Soc. Sec.*, No. 21-CV-01151 (AEK), 2022 WL 4593069, at *9 (S.D.N.Y. Sept. 30, 2022) ("'Cherry-picking' would be a more appropriate argument if the ALJ had ignored potentially contradictory evidence."). Rather than cherry pick evidence, the ALJ considered evidence both favoring and not favoring Plaintiff. *See Rivera v. Kijakazi*, No. 22-CV-

06976 (RWL), 2023 WL 6035665, at *7 (S.D.N.Y. Sept. 15, 2023) ("The ALJ did not cherry-pick favorable evidence while ignoring other evidence; to the contrary, she cited evidence both favoring and not favoring [the plaintiff]."). To the extent Plaintiff is asking the Court to reweigh the evidence, it is not for the Court to do so. *See Cage v. Comm'r of Soc. Sec.*, 692 F. 3d 118, 122 (2d Cir. 2012) (Court must "defer to the Commissioner's resolution of conflicting evidence.") (internal citation omitted).

In sum, having reviewed ALJ Singh's decision in light of Plaintiff's arguments, the Court finds no error in the ALJ's assessment of Dr. Cally's opinion and finds that the RFC for light work with additional limitations is supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:     New York, New York
           July 17, 2024

_____
STEWART D. AARON
United States Magistrate Judge

30